King, J. (orally).
This action was commenced in the Court of Common Pleas of Wood County, and after a trial and judgment, appealed to this court.
The petition alleges that the plaintiff is the owner of lot number 206, Block 30, in the village of Bowling Green, situated at the intersection of Main and Wooster streets, and being eiglity-one (81) feet and three (3) inches on the line of Main street, which runs north and south, and one hundred and sixty-seven (167) feet on the line of Wooster street which runs east and west; and that the authorities of the village are interfering with the plaintiff in his possession of said lot and claiming a portion of it.
The answer admits plaintiff’s ownership of the lot in question, but not of the dimensions claimed, and sets forth *494 that the village has occupied a strip of land on the north side thereof, and as a 2>art of Wooster street, seven feet in width. That the same was dedicated by the owner of said lot to the public as a part of said highway forty years ago; ' that ever since the public have used it continuously and adversely to the owners of said lot, and that they have thereby acquired the said highway by prescription and by adverse 2iossession.
These allegations of prescription, adverse j)088688*011 and user are denied in the reply. The evidence makes about this state of facts: That the title to this lot was acquired from the government of the United States by Alfred Thurstin; the date of this conveyance is not given, but the description in the deed to Thurstin is the same as that set forth in the petition of the plaintiff,
That Thurstin and wife conveyed the 2>roperty by that description in 1852 to William Lewis, and William Lewis conveyed to Thomas M. Pike, and he to G. Z. Avery. All of these conveyances were made in 1852. That G. Z. Avery conveyed the itemises in January, 1853, and thereafter various conveyances were made until August 7th, I860, the premises were conveyed to G. Z. Avery again. January 1st, 1807, G. Z. Avery sold and conveyed the premises to Roger Lease, who afterwards conveyed through the medium of a trustee to his wife, and with his wife conveyed the same to Emerine & Macauley on November 30th, 188(5, who were the owners when this action was commenced, but who, while it was pending, on November 3rd, 1894, conveyed to the plaintiff, who was substituted as the plfiintiff in place of the original plaintiffs. These conveyances described the lot and land as described in the 2>etition.
In 1843, the commissioners of Wood County established a county road, which is now known as Wooster street, of the width of sixty feet, and its direction and lines were surveyed and a plat thereof made and the descrÍ2')tion re *495 corded. It was a country road through a very sparsely settled region.
About 1855, the village of Bowling Green was incorporated, and in 1852, G. Z. Avery, who is mentioned in the * above enumerated list of conveyances, having purchased this lot, commenced'to build a hotel upon it. There were no fences on either of the road lines at that time as near as can be ascertained from the testimony. Avery commenced to build a hotel 26 by 44 feet, the narrow part abutting on Woosteiqstreet, the long part on Main. He set the north line of this hotel back from the actual line of Wooster street about twelve feet. He says in his testimony that he “calculated to build a platform on the side of the hotel about twelve feet wide, if he kept the property, for the guests of the hotel to occupy as a place to sit when the weather was suitable. ¡That there was no sidewalks in the town at that time. ”
Before the hotel was completed Mr. Avery sold out to a Mr. Thomas, who completed the hotel, and who also built the platform on the north side or end of the hotel about twleve feet in width, and it remained there by renewal or otherwise, of that substantial width, from 1853 until the hotel was burn? ed in 1887 while it was owned by Emerine & Macauley.
At the time of the building of the hotel, and for sometime thereafter, the lot was unfenced, and the west line of the hotel, the longer line, was set back from the east line of Main street about the same distance, and for the same purpose as on Wooster street.
Before Bowling Green was incorporated, the commissioners had under proceedings before them reduced the width of Wooster street to forty feet. After the incorporation of the village some years, an attempt was made to widen Wooster street to its orignal width of sixty feet, and for that purpose the owners were requested to dedicate ten feet on each side which would restore the street to the width it had *496 been originally established as a country road; and the owners of property abutting on Wooster street, in this block at least if not in any other, did dedicate the amount of land required, and Wooster street became sixty feet in width as it was orignally established, and this left the north side of the hotel mentioned the distance before, stated, namely, about twelve feet from the south line of Wooster street, and between that line a board walk some twelve feet wide was placed for the convenience of the hotel.
Some years after the hotel was erected, this walk was extended along the balance of the lot to the eastward, generally of the width of six feet, and all of this walk was within the'line of the lot as described by, the deed; and over this walk, which was a board walk, the pirblic have uninterruptedly traveled since it was originally laid, to the present time.
The defendant claims that there was a dedication of this strip of land about six feet in width to the village by the owner in 18»2, Gr. Z. Avery; and if not, that there has been acquired by the public by an uninterrupted use for mere than twenty-one years the title to this strip of land as a street by prescription, and the claim is also insisted upon as stated in the answer that this strip has been acquired for a street by adverse possession.
As I have stated, all of the deeds described the lot, giving its full size, which is eighty-one feet and three inches in width on Main street. If this strip be allowed to the village, it is shown by the plat presented that the strip in question is about six feet and two inches on Main street, and will reduce therefore that line of the. lot to sevent.y-seven feet and one inch.
There is no evidence in the case showing an intention on the part of any of the owners of this lot to dedicate that strip of land to the public use, nor is there any evidence showing that the public, meaning the people who have trav *497 eled over- the lot at the places where the sidewalks were built, or the platform which, amounted to a sidewalk, was built, did so with the idea that they were within the proper and established line of the street, or that by such use they were establishing a claim of right to this strip.
The corporate authorities have not exercised any control over the strip, as shown by the testimony. In 1869, an ordinance was passed to widen Main street, and it described this lot as fronting upon it eighty-one feet and three inches in length. The lot owners were requested to dedicate a portion of land on Main street, and the owner of this lot did donate the width required, and described this lot as having a frontage of eighty-one feet and three inches, and the strip of land which he donated as being of that length and of the width of teu feet.
In 1869, the council improved Main street by macadamizing it, putting in curbs along it, and at the intersection of Wooster street they turned the line of the curb by a curve to the eastward, and extended it to the cross-walk on the east side of Main street, and the curved line, as it turned and extended eastward, was the same distance from the established street line as the curved line on the north side was from the north established street line.
The village at the same time, by resolution, notified the owners of lo"t 206 to build a stone sidewalk along Main street eighty-one feet and three inches in length, which they did at a cost of $214.00, and the village also assessed them for the street improvement for the same length at the amount of $2.00 per foot.
The corporation, before 1891, never built any sidewalk, nor had they ever, by any resolution or ordinance, recognized that this strip was included within the line of the street.
In 1891 they passed an ordinance for the improvement of Wooster street by macadamizing it and setting curbs, and *498 under that ordinance and instructions of the council the engineer prepared a plat of the improvement, which showed upon it the south line of Wooster street as now claimed by plaintiff, and as shown in the original survey establishing that county road.
After this plat was prepared, members of the council, or a committee of the same, asserted a right to a greater width of this street on the south side, and the owners, or rather John Macauley, one of the owners, met a committee of the council and discussed with them at some length the propriety of the claim they were making, Mr. Macauley insisting that the street line had been laid out and established, and that the village would have no authority to take into the street the strip of land in question. But the committóe asserted that they had such right, and said to him that they proposed to put the south curb over a distance of six feet from where its line was shown upon the profile prepared by the village engineer. Mr. Macauley objected to this, but observing that this proposed curb line did not reach the line of his property, as he claimed it, he left the council committee without saying anything further than making an earnest protest.
Thereupon a resolution was introduced and passed by the council directing the committee on streets to make such change in the original plan as they deemed best. They thereupon directed the engineer to change'the plan, making the south line of the curb six feet further south. .Upon the improvement of Main street, before mentioned, a ■ catch basin had been constructed at the corner or the turn in the curve; and following the change in the plan for the improvement of Wooster street, when the improvement came to be made that portion of the curb which had been turned in from Main street was torn up, together with the catch basin, and moved to the south about six feet, and then placed upon the new line, but which is about four feet to *499 the northward of the south line of the street as originally laid out, leaving that distance or space within the old limits of the street for a sidewalk.
There is other evidence to show that Mr. Lease, who occupied this hotel property longer than any other person, maintained and claimed while in the occupation of it, that this street line was north of his building, at substantially the place where it would be if the street were as originally laid out, sixty feet in width. That this line had been pointed out to him by his grantor when he purchased the property in 1869, and the testimony is explicit that when he conveyed to Emerine & Macauley, he and his wife,— she having the legal title — said to Mr. Macauley that the line of their lot was a certain distance north» of the hotel, and Mr. Lease himself, being requested in the presence of his wife to point out the place, stepped out of doors and did so, indicating about the same line as that now claimed by the plaintiff; and that Emerine and Macauley had so understood it when they purchased, and they conveyed the lot to the present plaintiff with the same understanding.
After the burning of the hotel there was a small building erected for a store building on the lot, and about the same distance from the claimed line as the hotel.
The question presented to us is, whether the village has acquired the right to this strip of land by reason of the fact that the public have used it, in the absence of any intention on the part of the owners of this lot to dedicate that strip to public use as a part of the street, and in the absence of any claim on the part of the public or of the corporate authorities who represented the public, that the use made of that strip was under a claim of right.
' A great many authorities have been submitted, but we shall only refer to a few of them. A few principles, it seems to us, are well settled. It is essential to any dedication of land to the public that there should be an intent to *500 dedicate, and if such intent is absent, there is no valid dedication. This intent may be manifest by facts and circumstances, if it is not expressed, but the facts relied upon as to show an intention to dedicate, must be such as indicate an unequivocal intention to devote the strip of land in question to the public use. There must also be an acceptance, and until there is such acceptance the owner may revoke a dedication, and until acceptance the municipality cannot be charged with the obligation to repair or be liable for injuries caused by its want of repair. The general public must have used such land claimed to be dedicated under a claim of right to it, and not by mere permission of the owner, without interruption and without any substantial change, for a period sufficient to establish prescription.
Now, it has been held in the case of Montrose v. Parker, 40 111. page 581, that where a road sixty feet wide was laid out, the claim of the public, without regard to where they have walked or travelled, will be referred to their legal claim of right; that is, -as the road was laid out, and no title by prescription will be acquired by the public by the use of the road a greater width than was laid out or a few rods off its true line, for a period of twenty years or more. To give the public such title, its use must have been continuous for such period of twenty years, under a claim of right, in which claim the owner must have been shown to acquiesce.
It is said in 30 Iowa, page 258: “A highway cannot be acquired by prescription based on use when such use was by leave, favor or mistake.” '•
In State v. Schibb 47' Iowa 611, it is said that where the public have used and improved a line of road varying from the established line, the owner of the adjoining land, on discovery of the mistake, can set liis fence out upon the true line.
And in the cause of Harding v. Town Hall, 61 111. page 102, it was held that where the commissioners had laid out *501 a highway fifty feet wide in 1888, and in 1847 had graded and improved it to the width of sixty feet, and thereafter the public had used it to the width of sixty-six feet or more continuously until 1869, the encroachment all the time being upon an unfenced line on one side of the highway, that when the owner discovered' or ascertained where the true line was, he might reclaim his line from the highway; and that the use and improvements by the public in the absence of an intention on the part of an owner to dedicate, would not vest the extra width in the public to the exclusion of the true owner thereof.
A good deal has been said in this case about the"right of the public to accept by use lands for street purposes, regardless of the action of the corporate authorities. We do not understand this to be the rule in Ohio. The title to the streets is vested in the corporation, and it has been decided that the corporation cannot be charged with’duties relating to streets and highways that it has not accepted by some act which amounts to a legal acceptance. So'me affirmative action on their part is necesssary to indicate their acceptance. See 8 Ohio State 447, and 19 Ohio State 238.
Applying these authorities to the facts in this case, we think it is clearly shown that there has never been any intention by any owner of this land to dedicate the strip of land in controversy for a street or sidewalk.
The use made of it has been without any claim of right on the part of thejpublic or any member of it, and without any intention on the part of the owner to part with his property in it.
The corporate authorities have done no act accepting it. The land has been conveyed and repeatedly conveyed by its owners, describing its lines as originally laid out, and with reference to a street sixty feet in width on the north side.
The construction of this hotel at the early date it was con *502 structed, was a matter of convenience to the proprietor in putting it back from the line of the street, and a wide platform was built, which may be called a sidewalk, over which the public passed, and which was used and occupied by the proprietors of the hotel and their guests as a lounging place during all the time the hotel was in existence. And there was no attempt of the corporate authorities to assume control of this strip of land until there was a distinct controversy about it. They were then notified by the owner not to improve the street with reference to airy line except the true one, so that the owner of the land is not estopped by any conduct or words of his from asserting the true line. It has been a case of mutual mistake on the part of the owner and the public as to where the true boundary was, and, as said in some of the' authorities cited, the occupation of the public under those circumstances beyond the true line will always be referred back to the true line of the highway.
The rule in such case is different than where the highway or the right of way is acquired in whole by public use.
Here the highway is not in question. It has been open since it was originally laid out. It has, on the maps and surveys, and on the records of the commissioners of the county, defined lines and an established width.
We hold that that width cannot be increased without the intention of the abutting owner to so increase it or the intention of'the public to acquire the increased width. And, therefore, the injunction prayed for in the petition will be granted, and the title of the plaintiff to the line of his lot as described in his deed and petition, will be quieted.